The next matter on the calendar, the last on the argued calendar today, is an appeal from the decision of the District Court for the Eastern District of New York to deny an application to quash grand jury subpoenas. Last week the panel requested that the parties advise the court as to whether argument could be held in open court or whether measures were necessary to close the courtroom and to seal the proceedings. The parties informed us last week that such measures are not necessary at this time. The appellate has requested, and all this is by way of preface, that the court make clear before an argument in open court began that argument should proceed without reference to the names or identities of grand jury witnesses, the substance of testimony, the strategy or direction of the grand jury investigation and what that investigation is uncovered, and the court does hereby direct that those matters should not be referenced during argument. Before we proceed, let me just ask the parties, has anything changed about your position from last week that this is a matter that can proceed in open court? No, nothing has changed, Your Honor. Okay, thank you both for considering this subject and for conferring on a method by which we may proceed, and I believe we are ready to proceed with oral argument. Thank you, Your Honor. Good afternoon. My name is Harold Druval. We represent the appellants, myself and my partner, Kathy Fleming. I'd like to begin the argument by simply saying that the test which we think is dispositive here is if you look at what the government has said, what it has written, and what it has agreed to. They are the three key things. First, if you look at what it has said, the Department of State made it very clear in the document which we've provided the court since 2011 that the determination of the grant of immunity rests with the sending country. Whether or not a particular diplomat or someone who is covered by diplomatic immunity is accepted by the receiving country boils down to the question of whether or not that country wants to, forgive me for using the old Latin term, deem them persona non grata or, in the modern terms, unacceptable, and ask them to depart the country. So first, that's what the government, the Department of State has consistently said. In fact, in the Davis case, which is referred to in that transcript, the United States took ... Is that the case involving the fellow in Pakistan? That's correct, Your Honor. Involving the Pakistani, the American who is accused of, I believe it was murder of a Pakistani, and the United States took that position clearly. We believe that was a fair and accurate statement of international law. Second, if you look at what the government did in this case, although it is after the decision of the district court, after a series of diplomatic notes, ultimately the government gave all of the workers, including one who was charged with a crime, the ability to freely leave the United States, including one who was a material witness, the government notified that their status would terminate at a specific time. That's contained in the last diplomatic note, which is a part of the appendix which we provided to the court. And by that specific time, when status was going to disappear, they left the country. They left it pursuant to instructions. In fact, in one case, the one charged with the crime, the question was asked of the government ... Does that bear on the question of whether or not registration is a precondition? Because Your Honor, registration for these workers before this court and the registration for those workers were in exactly the same position. And registration is not what the diplomatic note that the government refers to requires. It requires notification, not registration. And I submit there are two different things, because if we look at ... Why isn't the State Department's view of what this is, notification versus registration, entitled to some deference? It is entitled to deference in one respect, but not when it contradicts the clear language of the bilateral agreement between the two countries. This court ... The bilateral agreement between the two countries is not 100 percent in your favor in that regard, because it ... If I can just look at the language here, it says that these personnel shall enjoy the privileges and immunities accorded administrative and technical staff of the diplomatic mission under the VCDR. And then it has some other language. But those privileges and immunities, if they are conditioned on some sort of notification or registration, then they are being treated equally. Well, Your Honor, the bilateral agreement does not say ... It doesn't address the question of whether there is ... It leaves out the question of whether those prior notifications slash registration is required. Well, two things, Your Honor, if I may. First, it says that they shall have the privilege and immunities not in accordance with the Vienna Convention, but the privileges and immunities accorded to the members. And really, Your Honor, if you read it fairly, what it's saying is the privileges and immunities that ... If the government's right, then privileges and immunities that are accorded the administrative and technical staff of the diplomatic mission are also subject to prior notification slash registration. Respectfully, Your Honor, no, that's not true. The privilege and immunities accorded to technical members pursuant to the VCDLR are a set of privileges and immunities. I submit they are a defining class of protections, not ... And the authors of this could have very simply said as ... He's saying there could be some ambiguity here. That's my point. And once there's ambiguity, then diplomatic notes come into play. Well, if we turn to the diplomatic notes, and I submit, Your Honor, I don't think that's I think as clear as a bell. But if I turn to the diplomatic notes, we have the benefit of the diplomatic notes between the only bilateral notes are the contemporaneous notes that have been rendered since the decision of the ... They don't have to be bilateral, do they? I believe they do, Your Honor. The agreement specific ... Can't they get a note from the State Department saying what it wants? The note that was ... The 1993 note or whatever, 203 note. The 203 note preceded this agreement, Your Honor. Number one is not referred to in the agreement. Number two, nor incorporated in the agreement. The agreement itself, I think, refers to how to deal with ambiguities, if I'm not mistaken. It says you refer ... Including taking into account notes. It says you refer to their plural diplomatic notes, which is a point we made in the district court. And there are diplomatic notes ... Diplomatic notes from either side. It doesn't have to be a note that's necessarily agreed. Country A has five different diplomatic notes that say ABC. The other side has five diplomatic notes that say XYZ, et cetera. Then you look at them all. Respectfully, if you look at the diplomatic notes that exchange between the parties in connection with this agreement, from the start, China asserts unequivocally that registration was not required. Unequivocally states it repeatedly through all of the diplomatic notes. I submit that a diplomatic note that precedes an agreement and is not incorporated by reference in the agreement cannot somehow be engrafted by the court as a unilateral document. Otherwise, the United States could obliterate this bilateral agreement or any other by sending a simple diplomatic note in and of itself and end the bilateral agreement. I submit that's not what the contract with these parties agreed to. And I think you're honest to ... Well, by the same token, the foreign country here, I'm going to refer to as a country, if the United States could vary the agreement with a note, so could the foreign country. That's precisely ... I think that's your point, right? Yes, because of the doctrine of ... You don't look at just one side. You start looking at both sides, and then you'd effectively have no agreement. That's correct, Your Honor. Indeed, here, there are notes from the foreign country, albeit after the fact, but nonetheless, notes from a foreign country saying that there is no pre-registration or pre-notification requirement in the bilateral agreement. That's precisely correct. Why don't we go with that? We'll just take their position. Because since diplomacy is based primarily on reciprocity, Your Honor is correct that we have to look to if the American Department of State could create these sets of additional conditions not incorporated in the bilateral agreement, then so could the foreign country impose. And there is no limit as to what those conditions could be. Isn't that a matter of diplomacy rather than court fiat? Because if the State Department wishes to precondition how it views its obligation, what's wrong with them doing that as a matter of diplomacy, as a matter of executive authority? Because they have an international agreement they have agreed to between two countries, which under the supremacy clauses ... Yes, Your Honor, Your Agreement, but for administrative purposes, in order for us to accord immunity, in order for this whole thing to work, we've got to know who the people are. Clearly they are notified. We pointed out, and I believe it's point three in our initial brief, and we pointed out to the trial court, there were diplomatic notes exchanged at or about the time of the application for the A2 visa. The visa application is filed, and at that point in time, the country sends a diplomatic note identifying the people, their date of birth, their passport number, and when they are going to arrive. The information is out there, and afterwards, one can go and do the research and all of that. Who do those notes go to? They go to the Department of State, to the embassy. The Department of State has them. They go to the consulate in the country, pursuant to what ... That's in connection with the A2 visa. That's in connection with the A2 visa process, yes. The A2 visa is explicitly for construction party workers. It is explicitly ... Well, no. A2 visa goes beyond ... The category goes beyond construction. But here, in this case ... But in this case, it is strictly for ... They weren't tourist visas. They were A2 visas for this project. That's correct. The process is that the mission requests specific workers. An application for an A2 visa is filled out. Then, foreign ministry notifies the consulate of the fact that these workers will, by a diplomatic note, be traveling on this day, pursuant to this ... No. There's no need to comply. You're saying, in effect, there's no need to comply with the diplomatic note of 2003, because the information's already been provided. Go look for it. State Department. It's there. As a general rule, we don't have to comply with that. Not go look for it. It's specifically given for specific workers traveling on specific days for the specific place that they are going to work. In other words, you're saying there was compliance with the note. I believe there was compliance, pursuant to that provision. Now, the next step is, when we look at these individuals and whether or not the subpoena should be quashed, we look at them as they stand now, as they stand having the country actually went up and on the electronic system after this, as a measure of comedy, as described in the diplomatic notes. They filled out the registration forms. The United States changed its position. It was no longer, we want registration. Now we want answers to specific questions. When those answers to specific questions were given, in the last brief we filed, the supplemental brief, and the diplomatic notes are contained there. The last diplomatic note from the United States to the country enumerates the names, including one of the individuals who is before this court, and says that their status will end at a particular date. Now respectfully, what status are we talking about? Their status was either a diplomatic status or it was, their visa would have effectively been revoked by the lifting of their status. Yes, ma'am. For some of the appellants here, there was a registration through the formal process that the State Department is saying must be followed. That's correct. Am I correct about that? Yes. Doesn't that suggest that it wasn't clear to the sending state that it was, that it could rely on the A2 visas alone, at least for those two appellants? No. There were prior registrations because, as was explained in the district court in the transcript, because there are a number of IDs that are relevant and important. One of them is the tax-exempt in the construction aspect. One is the tax-exempt card. And one or more of the employees who are working the construction sites needed that tax-exempt card so they could acquire things locally in the United States. And those people who were so registered, registered in order to obtain those identifications. The other construction workers did not need that kind of identification. They did not need a tax-exempt card or a State Department driver's license. And so there was no need for registration. But again, if you look at the subsequent diplomatic notes from China, it is luminously clear that it was never their understanding under the COCA agreement that any, quote, registration was required. And as I said, I think the court should look at the diplomatic note with regards to, quote, registration. It does not require registration. I'm referring to the 2003 note. I'm sorry. Is that in the appendix? That's in the initial appendix, Your Honor. It's actually in the special appendix. As well. Yes. It's GA-09. It's in the red brief, I think. That's correct. In the red brief, GA-09. That's what you're referring to now, right? Mr. Ruvo? Yes. And it says, to notify the Department promptly of the arrival or appointment and diplomatic note. Again, six years before this agreement. And the note, the diplomatic note itself does not refer to construction workers. It refers to people who are receiving immunity under the Vienna Convention. Mr. Ruvo, I have a question for you. Of course, these notes that were exchanged at the time of the appeal or even after it was briefed were definitely not part of the record in front of the district court. That's correct. There's also no question that now there's a dispute between the United States and the foreign country as to this registration requirement. That's correct. No question. It couldn't be clearer. That's correct. It might not have been so clear before, but it's clear now. So why shouldn't, what are we doing here? Are we wading into something that we should not be wading into? Should we let these, I know that the foreign country is not a party to this appeal. They obviously have an interest in it. In fact, they even said in one of these notes that we're providing the information from, we are representing to the Department of State what the construction company thinks the rules are, something like that. There's some reference to that company by name. I'm just trying to figure out, I'm not sure if it's a non-justiciability or a justiciability question or just as a practical matter, is this something that needs to get, we know there's a dispute. Maybe it should just get sorted out between these countries before a court starts wading in and saying otherwise. Well, two things, Your Honor. First of all, so that it's clear, the original diplomatic note from China specifically refers not to the company, but rather to their view that the COCA II agreement between the governments does not require notification. It does. There is one that refers to the company. What it refers to, the answers to the questions they indicate was information provided by the company. I believe that's what the court is referring to. To answer your question, A, if you look back at the opinion of the district court and the argument of the district court, Judge Gleeson clearly says that he is, or the decision is clearly predicated on his finding that, quote, registration is required. And when we raise the question of diplomatic notes that might come from the other country contradicting it, he says, and I think wisely, well, if the facts were different, you may get a different result. And subsequent, the facts became different. And they became substantially different. It was one of the reasons, Your Honor, why we moved the record. And the court graciously allowed us to include in the record what's included in the record. However, there are other factual issues which may or may not bear on the decision that the district court reached. And frankly, we don't know what decision the district court would have reached at this point, given these facts and circumstances. Do you still think that we should send it? I mean, you were the one who moved for the remand, right? Yes, we moved for the limit. Or the court, the circuit denied that motion. That's correct. Now there's even more notes that have come in after that, or at least one more has come in after that, right, even after the motion. There are several, yeah, I believe there were two notes after that. Do you, is one possibility, we're trying to figure out the right way to do this. Is one possibility to remand it to the district court to, I don't know, to review all these notes and at least in the first instance come up with a conclusion, which of course could still be appealed? The reason we moved for a remand, Your Honor, was it was our view that a full record at the district court, which might include testimony, might include, for example, one of the individuals involved in the early stages of the COCA agreement in terms of why this agreement is so unique from the United States. Because you couldn't, the court could not compel someone from the foreign country to absolutely, totally understood. If there's a hearing, it's kind of a one-sided hearing. I don't think it's... It's not one-sided, but it's not complete. The only way the foreign country weighs in is by the diplomatic notes. Unless the foreign country chooses to do something, which they have not to up to this point, although in all of the notes, I believe in all the notes, but almost all the notes, they specifically request that the court be notified of what their position is. Right. Now, you just said testimony a moment ago. Yes. I'm trying to figure that out. With regards to issues of notification, what the State Department knew when they knew it, those kinds of issues I think might be quite relevant. In fact, one of the things that we believe the process of notification that the A2 visa application requires is fulfilled by the demand by the State Department that there be a diplomatic note at that stage. Government relies on the fact that, well, an A2 visa is not evidence of diplomatic status. It may or may not be. That's a different issue. The issue I'm making is simply that requiring the diplomatic note that informed them, the State Department, of who was coming, when they were coming, prior to the issuance of the visa, what the travel dates would be, what their passport number, all of that information is precisely the information that is appropriate for notification. I do want to stress, however, that China requested as early as April of 2016 that the court be informed of what China's position was. I also want to make the point in response to your question, Your Honor, that with regards to what the court should do, what is the remedy here, I think is what Your Honor's question is, there are two issues going on at the same time. The first issue, if you will, is somewhat between China and the United States as to what the agreement meant. The second issue is as between these workers and, with the interest of China behind it, and the United States as to whether they can be compelled to appear and testify. They're two separate issues. So if I deal with the first issue with regards, I can deal with it on the text of the language, number one, but I can also deal with it with regards to the concluding sections of the bilateral agreement that spells out the manner in which disputes will be resolved. And it specifically does not contemplate action in a court of the foreign country or a court of this country. It specifically contemplates that there will be negotiations between the parties. And as a result of those diplomatic negotiations, the issue will be resolved. With every respect except whether or not this court will issue an order that will direct workers who are presently in China to do something to compel them to testify, with the exception of that narrow area, the diplomatic process has proceeded. It has reached a conclusion. All of the workers are gone from this country, including workers who, other than these, who received and accepted subpoenas. They're gone. And now the question remains as to whether this court will somehow compel this narrow band who are before this court and somehow determine they're going to be treated differently than the And I submit you should not. I submit a remand is not necessary. I believe this court, since it reviews this de novo, should simply quash the subpoenas, dismiss the case, and end the matter. I think it is that simple. We'll hear from the government. Thank you, Your Honor. May it please the court. Alex Solomon for the government. I think it's truly breathtaking that what the appellants are asking this court to do is to overrule the executive branch's interpretation of its own executive agreement with the foreign power. As a practical matter, how are the people going to be brought to the grand jury? Appellant counsel had promised us after the six of the original seven appellants left the country that should we be successful in our litigation against their motion to quash the grand jury subpoenas, that they would make their best efforts to bring these witnesses back into the country to testify in the grand jury. At what point was that promise made in relation to the developments that have occurred since the matters in the district court? My understanding is that's been the promise throughout. Appellant counsel have consistently represented to the government that they will make their best efforts. Certainly, they might need the cooperation of the U.S. State Department to bring these witnesses back into the country to testify in the grand jury. The government remains very interested in obtaining the grand jury testimony of these witnesses. There is no express statement in any of these materials that registration is a precondition to immunity. This is a district court read the materials and kind of came to that conclusion based upon assessing the bilateral agreement and then the diplomatic note, which is there to resolve an ambiguity as well as the convention. Is that correct? That's correct, Your Honor. So that raises the question of the value of diplomatic immunity. Do you start off with a default that these people are immune, in which case there has to be a rather strict statement that somewhere in the materials that the parties have agreed that there would be some kind of registration requirement in advance, or is granting immunity more of an act of grace on the part of the country for which immunity is sought that the country can withhold it at its discretion if it feels like it or if certain things haven't taken place that it wishes would take place? I believe it's the latter, Your Honor, and that authority comes directly from the Vienna Convention, Articles 9 and 11, which both provide that the host country retains certain discretion to either accept or not accept persons coming from the standing State. And that is exactly what happened here. Wait, wait, wait, wait. It isn't accept or not accept. Is that the same as it's not really responsive to Judge Walker's question? I mean, in other words, someone could have immunity but not be accepted. Right. The person could be in the country, would not be accepted for the purpose of privileges and immunities, and I think this Court made clear in the Kostadinoff case, I apologize for the pronunciation, that's the 1984 Second Circuit case, that there is no obligation of the State Department to kick out or expel any persons from the standing State who it's not affording diplomatic privileges and immunities to. So there's a status of being here, being accepted, but not being given immunities. Correct. In this case, these workers had visas. They had A2 and G2 visas, but they did not enjoy diplomatic privileges and immunities. The Office of Foreign Missions from the U.S. State Department had not received notification, first of all, of five of the seven appellants, and then once it received notification and did additional legwork to see are these people that we want to grant privileges and immunities to, the State Department determined that it would not grant diplomatic privileges and immunities to. That State Department note where they asked all those questions, those follow-up questions, it seems like it was drafted by the Justice Department. It's very investigative in nature, right? They're asking very detailed questions about who these people are and what they're doing and so forth. Was it done sort of hand-in-glove between the State Department and the Justice Department? I don't think that's part of the record, Your Honor. No, it's not, but I'm curious because it's kind of, it's almost written by a prosecutor, but it comes from the State Department. I don't know. I'm asking. Certainly, both the State Department and the Department of Justice are parts of the executive branch of the government, and there was a certain amount of coordination between the Justice Department and the State Department. However, the State Department has its own good reasons for wanting to know exactly who is coming to this country and who is going to be afforded privileges and immunities. And, for example, finding out what precise projects these people who have been in this country for multiple years have been assigned to is something that the State Department has compelling reasons to want to know. And that's what was trying to know. People are coming pursuant to the agreement to do work in connection with the mission or related diplomatic facilities. Correct. That's the basis upon which the visas were granted. Correct. And, for example, if some people are located in cities where there are no diplomatic missions or facilities, that begs the question, what are they doing in this country, and why should we, the State Department, afford them diplomatic privileges and immunities? That's by way of example. The why might be answered by Section 9.6 of the bilateral agreement. There's a different question of what the remedy would be, but doesn't the, I mean, the agreement doesn't say anything about requiring registration or certainly none of the information that's reflected in the State Department's note that we were just talking about a moment ago. It just says construction party personnel. And this applies to U.S. personnel in the foreign country, just like it applies to citizens of the foreign country doing work in the United States. This is not some sort of, you know, the United States saying, look, we'll do you a favor and we'll enter into this agreement. It's a bilateral thing. Both sides are agreeing mutually to give respect to the other sovereign's citizens for certain purposes, right? Yes, and I think it's important to keep in mind that this is not a treaty. This is a bilateral agreement. Well, it's an agreement between, it's not a one-sided act of grace is what I'm saying. It's an agreement between the United States and the foreign country. Sure. And it benefits both sides. It benefits American workers in the foreign country working on embassies exactly the same way that it benefits foreign country workers working on embassies and missions in the United States. Yes. Two things to address that, Your Honor. First of all, the State Department is acutely aware of the fact that it has workers of its own in the foreign country and that it wants to protect the interests of those workers. Secondly, with respect to this 2009 agreement, this was not written in a vacuum. It incorporates by reference the Vienna Convention. It doesn't say anything about registration, right? It does talk about notification, though. Well, but the State Department was notified. They got all these visa, very detailed information in these visa applications of these people who were going to be working in the construction party. I know it's a big organization, but it's not as if they were unknown to the State Department. Well, this Court stated in the Kostantinov opinion from 1984 that the act of applying for a visa, an A2 or G2 visa, is not sufficient to obtain privileges and immunities. And that's something Judge Gleeson specifically noted in his decision below. He looked at the fact that to the extent that if applying for a visa in of itself is sufficient to satisfy the notification requirement, why even have the notification requirement? In fact, there are two different parts of the State Department. One part of the State Department that's responsible for the granting of visas, such as A2 and G2 visas, and another part of the State Department that's responsible for the grant of privileges and immunities to mission and consular staff here in the United States, and that's the Office of Foreign Missions. Does a foreign country also have a notification requirement? Yes, it does. And have there ever been any cases or incidents involving this kind of raising this issue in the foreign country? No, we've complied with our obligations. And how is their notification requirement communicated to us, to this country? Do you know? Is that a diplomatic note? Diplomatic note that goes directly to the Office of Foreign Missions. That's for the purpose of – I'm talking now about the one that the foreign country issued that established, in effect, a registration requirement. Yes, it goes to the Office of Foreign Missions. It's a diplomatic note that goes to the State Department's Office of Foreign Missions. Are you saying that one did? No, I'm not saying that one did. I'm saying to the extent, for example, that two of the appellants were registered, they were registered pursuant to diplomatic notes which were sent to the Office of Foreign Missions. No, no, I'm asking for the reciprocal side of this. Right. The foreign country situation. This case is now flipped over and it's in the foreign country. Sure. And is there a requirement of registration before the United States can claim diplomatic immunity in that country? My understanding is that there is, based on consultation with the Office. You don't have any materials or diplomatic notes that relate to that, and there is no specific bilateral arrangement that requires that. That's correct. Is it the Department of State's position that in order for American diplomats serving in the foreign country to have immunity, that those people have to be registered in the foreign country and accepted and have their registrations accepted by that foreign country in order for these Americans to get immunity and privileges and immunities in the foreign country? That is the State Department's position. But isn't that inconsistent with some of the other materials that have been submitted by the appellants, like that Davis case, and I forget. There seems to me there was another one. Well, there was the Pakistani case from 2011. It's really unclear what exactly happened there. That's a very incomplete record, and it's also uncertain what precedential value our relations with a different foreign sovereign in the context where we are the sending nation, they are the host nation, in the context where we provided one-year notification before that incident. In this case, there was notification before we subpoenaed these witnesses for the grand jury. So they're very different cases. Am I right that the bilateral agreement, the 2009 bilateral agreement, which is often referred to as COCA 2, C-O-C-A 2? Yes. I'm not sure what C-O-C-A stands for, but it's pretty clear that it refers to this document. That's correct. It seems to me that I think both sides agree that the law is that we can construe it in the way that we would construe a contract, right? We, the court, that is. Yes, but given substantial deference to the State Department's own interpretation of its own executive agreement. What about Chinese? What about deference to the views of the other country? I mean, how is the deference to the State Department greater than deference to the ‑‑ I don't even know what it's called, whatever their counterpart is in the foreign country. That has said just the opposite of what the State Department said. I'm not sure why. Why should we pick one over the other? There's constitutional authority vested in the executive to receive and send ambassadors. So this is a core executive power to decide whether people have ‑‑ I'm sorry, it's a core executive power to determine how to interpret the executive's own agreements with a foreign power, and that's what's happened in this case. We live in the United States. We don't live in the foreign country. And appellate counsel has not located one case in which this court or any other court in the United States has ever deferred to the political view of a foreign power as to the meaning of a treaty or an agreement with this country. You know, you keep saying that they're asking us to defer to the view of the foreign power. I don't think that's what they're asking. I think what they're saying is, read the agreement, which is between both powers. Both countries signed this agreement. Not deferring to one or the other. I think we're deferring to the agreement, the written words in the agreement. I think that's their position. I'm not sure they're asking us to defer to the views of a foreign power. I don't see that anywhere in here. There are views, but they're not asking us to defer to them. I think what the government is asking the court to do is to defer to the views of the State Department on the meaning of the State Department's own agreements with a foreign power. No, I do understand that, but you're accusing them of the flip side, the mirror image of that, and I'm struggling to find where that is. I don't see any arguments. Anyway, whatever. I don't see it in the briefs. But I see your point. You're saying we should defer to this. Since we are here in the United States, and these people are here. Well, they're not here right now, but they were here pursuant to this agreement. Right. That we should defer to what the State Department thinks. Right. And one final point. I apologize. Just to clarify on that, and then you can go on. When you say defer to what the State Department thinks, are you referring only to the December 9th, 2015 letter that we have from the State Department from Mr. Seagroves? That's correct, Your Honor. VA-13? Yes. Only that or the notes that have come in subsequently? Well, the notes that have come subsequent also make clear that to the extent that there has been no formal registration or no formal notification, that these appellants are not entitled to privileges and immunities. Where does it say in the December 9th, 2015 note what you just said? I guess I just don't see that in there. It does refer to registration, and it says that these seven people are either never registered or not currently registered. Right. It does say that. Yes. And on the second page, it cites – Okay, I'm sorry. Go ahead. I apologize. On the second page, and I'm trying to find the exact document here. The second page, there's a cite. VA-13. Page number? GA-13. VA-13. In the red brief. Thank you. Thank you. On the third page, on GA-15, there is a cite to COCA-2, which provides that – it's the same cite that we've gone over – that construction party personnel, blah, blah, blah, who stay in the host country as more than 30 days, shall be attached as appropriate to construction party diplomatic missions. And it continues to say that these personnel shall – Let me read that whole sentence because – Sure. Attached as appropriate to either one thing or another. Correct. In other words, appropriately one or appropriately the other. Right. In this case – Not as appropriate in general. Yes, I understand. In this case, we're talking about the diplomatic mission. There's no – That's not what this is. This language refers to not the – it doesn't refer just to the diplomatic mission. It says attached as appropriate to either the diplomatic mission or to a consular mission. Right. In other words, pick the one that's appropriate. Right. In this case, the one that would be appropriate, arguably, is the diplomatic mission. There's no suggestion by the appellants that the consular mission would be appropriate. And it goes on to say that these personnel shall enjoy the privileges and immunities accorded administrative and technical staff of the diplomatic mission under the VCDR, or those accorded employees of the consulate under the other treaty I cited there. Let me – so here it's not the fact of registration explicitly. Right. It's the fact of attachment that triggers the immunity. It says shall be attached as appropriate to either A or B. These personnel shall enjoy. I mean, it's not expressly stating that that's a condition precedent, but it's closer to a condition precedent. Correct. But it says attached as appropriate. Correct. And does that also mean can you be attached without notification? From the State Department's perspective, no. It's not clear. That's, again, not clear. I understand that there's some ambiguity there. Yeah. But I think the next provision cited within this diplomatic note makes quite clear that the appellants here, at least the six who left, do not enjoy privileges and immunities by virtue of their present status. It provides that diplomatic – and this is in the middle. Privileges and immunities shall normally cease at the moment when he leaves the country. Is this a different document? No, this is December 9th, 2015. Where? This is on Page 3, Article 39, Sub 2 of the VCDR. Now you're pointing from the Vienna Convention itself. Correct. And so this brings us to the last point I wanted to raise. What's the relevance of the – you're pointing to Article 39, 2. The relevance, Your Honor, is that in this case, six of the seven appellants left the country upon the receipt of subpoenas. After that, we acknowledge that there were efforts by the foreign sovereign to register or to have them accredited through the Office of Foreign Missions. However, there is no legal basis for the United States Department of State to accredit someone who's overseas. The government has zero interest in doing that. I thought you were going to make the argument that somehow this somehow relates to a precondition to getting immunity. But in fact, 39, 2 says when a person enjoys privileges and immunities have come to an end, the State Department is saying, they shall normally cease at the moment he leaves the country. Correct. Isn't the implication here that these people under these circumstances had privileges and immunities that they lost when they left the country? I read it differently, Your Honor. I read this to provide that to the extent that the foreign country is seeking to accredit these individuals, and these individuals have already left the country, so they are not entitled under any condition to privileges and immunities. Let me just make sure I understand your argument about the period before they left the country, because I thought you were going to focus this on the preceding sentence where it says, these personnel shall enjoy the privileges and immunities accorded administrative and technical staff of the diplomatic mission. Correct.  Of course. Am I understanding correctly that it's the government's position that administrative and technical staff of a mission would not have immunity absent following through with the notification and registration process? Correct. Just to make sure I understand the practice, the State Department, after it receives notification, if it is accepting a person to come into the country, does it notify the sending state as a matter of course? I'm not sure if notification goes directly to the sending state, but a list is made that is publicly accessible and available for all to view. So let me follow up on Judge Lewis's question. So you're saying that administrative and technical staff of a mission do not have immunity without notification and registration? Correct. Where does it say that in either the bilateral agreement, which is an agreement, it's a contract between these two countries, there or in the Vienna Convention or in that other agreement that is referred to in the bilateral agreement, there's another one referred to and I forget which one it is now, or referred to somewhere where there was some other previous agreement between these two countries, the United States and this other country. The question is where does this requirement appear? That's the problem I think we're struggling with. I understand, Your Honor. The original requirement, the notification requirement, appears in the Vienna Convention, which is incorporated by reference into the 2009 agreement. The problem with that is there's a disconnect in the convention. At least it's not directly stated that it's a precondition to getting immunity in the convention. It's like there are two different concepts. One is the notification and the other is the immunity. But what links them in the convention? Right. Well, if you look at page 8 of our original brief, and this is at the bottom, the Vienna Convention provides that the Ministry for Foreign Affairs of the receiving state shall be notified of the members of the mission. And it goes on to define who is included as the members of mission, and which eventually includes the diplomatic staff, administrative and technical staff, which would be the category under which the appellants in this case fall. No question there's a notification provision. Absolutely. Correct. Judge Walker's question is where does it say that that notification is a prerequisite to getting privileges and immunities? That's the leap that we're struggling with. I think we're struggling with it. Yes, it says notification. Okay. Yes, I understand. It also says this notification requirement exists because, you're again quoting from the Vienna Convention, the purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing states. Sure. In other words, that would be a good spot to say this notification requirement is necessary because without it the foreign diplomat doesn't get privileges and immunities. I understand. It doesn't appear to say that. Okay. So if you start with the 2009 agreement, which says to the extent the 2009 agreement is silent on any issue, then you look to past treaties, agreements, and notes. So certainly the Vienna Convention provides for a notification requirement. And then if you look at the subsequent diplomatic note from 2003, which indicates, and this is on GA10, that the reporting requirements, and this is the second page of the diplomatic note, is essential or obligatory under international domestic law to enable the department to maintain accurate records of all current foreign government personnel in the United States and is essential to continued enjoyment by members of the missions and the consequence of the rights, privileges, and immunities to which they may be entitled. What does continued mean in that sentence? To the extent that diplomat... Let me ask a leading question. Sure. I wouldn't want to argue that continued in that sentence means you get privileges and immunities, but it's important for people like law enforcement and other government officials in the receiving country to know who these people are because, meaning the people who enjoy continued, who have continued enjoyment of privileges and immunities, it's important for those names to be known so that if somebody gets in trouble or a problem arises, that there's a clear record that, indeed, this is a person who has the continued enjoyment. It doesn't say prerequisite. That's a preregistration or something like that. It doesn't say that. It says continued enjoyment. Yes, but it does say it is essential to, and I would argue that continued is a reference... Essential to getting immunity or essential to good relations between the United States or... You had a convention involved. No, this note is just the United States. It's essential to good relations between the United States and foreign missions. That's certainly true. No question about that. But it doesn't say it's essential to getting the immunity in the first place. That's the narrow question. Well, that is how the State Department interprets its own diplomatic note, and I would argue that to the extent there's the word continued, that simply implies that this is not a rectoactive agreement. This creates an obligation going forward for sending states to register and to notify the Office of Foreign Missions of mission personnel coming to the country who wish to obtain privileges and immunities. The interesting thing is that nowhere in the actual documents that the State Department has issued or offered us does the State Department say that registration or notification is an absolute precondition without which there cannot be diplomatic immunity. But you're asking us to, in effect, hold that as a matter of Second Circuit law, and there's no case that says that, is there? Unless there's a body of international law that hasn't been brought to our attention or a case that's been brought to our attention. That would be the ruling that you're seeking. I think the ruling that we're seeking is that these appellants were not properly notified to the State Department as of the time of the issuance of the grand jury subpoenas. The question is, so what? They're not properly notified. So what? Does that mean that they don't get immunity or does it? I mean, you know, that's the problem. Right. And from the State Department's perspective, and I think as Judge Gleeson recognized, there are important policy reasons for having a notification requirement. And making it a precondition to giving immunity. Correct. And what we have in this case is an after-the-fact attempt to register these workers after the foreign country became aware of our investigation. And the fact that there were these after-the-fact efforts when these folks were overseas and not in sites in the United States, I think renders the whole issue moot. Let me ask you this. Do you think the non-registration or non-notification here was inadvertent or deliberate? Is there anything in the record to cover that? I don't think there's anything in the record to cover that. Certainly, the sending state was aware of this requirement because two of the seven appellants were previously notified to the U.S. Department of State. Okay. Well, what about the argument that your adversary made that applying for the visa is sufficient? I'm sorry. Could you repeat that, please? Applying for the visa is sufficient. The State Department was unnoticed. Yes. I think to the extent you embrace that argument, you might as well abandon any notification requirement in the first place. It's not the Office of Foreign Missions that issues the A2 or G2 visas. That's the consular offices around the world. The argument then is that that obviously isn't what's meant by the notification. Correct. Secondly, if the purpose is to have the smooth and efficient administration of diplomatic relations, then the notification is essential to that. Absolutely. Because otherwise, how does the State Department know who gets immunity? Correct. Without doing a whole lot of research and going back through applications and visas. Exactly. In fact, there are many, many people who receive A2 or G2 visas who for one reason or another don't enter this country. And I think we can all agree that the United States Department of State should not be issuing those persons outside the United States diplomatic privileges and immunities. If there are no further questions, we'll rest in our briefs. Thank you. I'll be extremely brief. Your Honor properly notes the question of a condition precedent, Mr. Walker. In fact, there is a condition precedent in the agreement, and that is the 30-day stay requirement in Section 9.6. And I believe this Court has as recently as I think it's August decided a Georgia's case in which it said that when there's an excellent analysis of what are preconditions and how you find out whether something is a precondition, and I submit if you do that analysis here, first looking at the text, see if there is one precondition included, it excludes all others, et cetera, you come to the conclusion that registration and or notification are not a precondition. But why would we do that given the backdrop of the Vienna Convention? I mean, I understand the ambiguity about notification registration, but the Vienna Convention is very clear that there's a notification requirement. But if Your Honor reads carefully the Section 9.6, it does not say these workers get immunity in accordance with the Vienna Convention. If it did, plumbers, electricians, people who work internally in the construction project under the Vienna Convention would not receive immunity because if it's in accordance with the Vienna Convention, those categories do not apply. What it says is those—that's correct. What this agreement says, and we could go into the historical reasons for this agreement, what this agreement says is those workers get immunity because they are involved in the actual construction of the most sensitive diplomatic units or facilities of a foreign nation. And while China or Russia or any other country in the world does not want their construction workers to be before a, quote, grand jury with the U.S. attorney and no one present, so too the United States does not want its workers to be alone in a foreign country being questioned by prosecutors there with no one present. That is the reason for this agreement, especially when it involves people who are working and building in those most sensitive areas. Your Honor also asked whether— Just backing up, going back to GA-15 again, these personnel are enjoying privileges and immunity accorded administrative and technical staff of the diplomatic mission under the Vienna Convention, and that takes us back into the Vienna Convention specifically referenced there. Because it's the only place where we can find what immunities they have. It is not in accordance with, but it is the privilege in accord with. So what they're saying there very clearly, I submit, is that since these definitions of what the privileges and immunities are are found in the Vienna Convention, we take a category of workers who would not otherwise get those privileges and immunity, and by this agreement we grant them those privileges and immunity under these terms. And the only condition, President, is to be President of the United States for 30 days before. With regards to notification, frankly, Your Honor, I think it's fairly clear from the diplomatic note which the United States sent to China on— strike that, I'm sorry— which the United States sent with regards to as early as April 2016 that the Department has received notices of appointment of all of the persons on the list. Second paragraph of that diplomatic note. And so there's no question that as we stand here today, notification was received. None. With regards to—we are not saying the visa application, Your Honor, Judge Walker, is in fact the point of, quote, notification. That's an electronic process. But a diplomatic note is actually delivered as to each individual, a list of individuals who are going to travel, when they are going to travel, when they're going to arrive in the United States. That is notification by any terms, and it is at the time a visa is applied. With respect to the argument that there are two separate parts of the Department of State that are at play, there's one United States, one Department of State. The fact that they have a box over here or a box over there, I submit, is not controlling. The last two points I want to make is Your Honor asked the question whether this was deliberate or oversight. I'm reminded of the provisions, and it's in our brief of, I think it's 22 U.S.C.A. Section 254D, which says that no privileges or immunities provided by law will be lost because a mission fails to do some technical task. And now, I believe that statute was designed to apply primarily to the mission immunity, but very fairly the language could apply to all others. Other than that, Your Honor, I have nothing further unless the Court has further questions. Thank you both. Thank you very much, Your Honor. The last case on the calendar is on submission, so I will ask the deputy to adjourn court.